Filed 7/3/24  P. v. Veloz CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HECTOR VELOZ,<br><br>    Defendant and Appellant. | B323616<br><br>(Los Angeles County<br>Super. Ct. No. BA475823) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Affirmed.

Joanna Rehm, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Chung L. Mar, Deputy Attorney General, for Plaintiff and Respondent.

A jury found defendant Hector Veloz (defendant) guilty of first degree murder for killing his wife, Sandra Velasco (Sandra).[1] We are asked to decide whether the trial court should have given a requested instruction on voluntary intoxication, whether the trial court should have stricken testimony from a city attorney that Sandra asked for help in modifying a protective order, and whether the trial court erred in admitting testimony regarding intimate partner battering (IPB) and prior domestic violence against two of defendant's former romantic partners. We also consider whether substantial evidence supports the jury's finding that the murder was premeditated and deliberate.

## I. BACKGROUND

### A. *The Indictment*

A grand jury indicted defendant on one count of murder. The indictment alleged defendant personally used a deadly and dangerous weapon (a knife) in the commission of the murder. (Pen. Code, § 12022, subd. (b)(2).) The trial court dismissed financial gain and lying-in-wait special circumstance allegations.

### B. *The Evidence at Trial*

We summarize the evidence at trial organized into three categories: (1) evidence concerning Sandra's relationship with defendant; (2) evidence pertaining to Sandra's disappearance and death in June 2017; and (3) propensity evidence in the form of testimony by two of defendant's former partners.

---

[1] Sandra's son, Michael Velasco (Michael), testified at defendant's trial. We refer to Sandra and Michael by their first names.

### 1. Sandra's relationship with defendant

Defendant and Sandra started dating in 2015. Defendant moved in with Sandra and her adult son, Michael, after a few months, and they married in 2015. Sandra's family and friends testified the relationship was marred by defendant's drug use and infidelity, as well as multiple instances of domestic violence.

The first instance of domestic violence established by the evidence at trial occurred in April 2016. An argument between defendant and Michael concerning the television volume escalated into a shoving match between Michael and defendant. When Sandra got between them, defendant grabbed her by the arms and left bruises. Defendant was convicted of misdemeanor battery and a protective order barred him from having any contact with Sandra. The protective order was later modified to allow for peaceful contact in November 2016.

The following year, in June, Sandra sent a text message to her friend and colleague, Brenda Hernandez (Hernandez), that said defendant "got aggressive again . . . ." Two days later, Sandra called the police to report defendant put his hands around her throat and held a pillow over her face. She was able to push him off of her and run into another room, but he grabbed her hair, pinned her to a sofa, and tried to "sex her up" and convince her not to call for help. Sandra escaped by striking defendant in the groin with her knee. Sandra was left with a raspy throat and bruising to her neck.[2]

---

[2]     During trial, defendant played a video recording of statements Sandra made when interviewed by Los Angeles Police Department (LAPD) Officer Mynor Santizo (Officer Santizo). Among other things, Sandra told Officer Santizo there had been

In addition to these incidents, Hernandez testified Sandra confided in her that she and defendant "were always fighting" and he "would push her[ and] grab her."  There was also testimony regarding specific instances of domestic violence that occurred on unknown dates—perhaps, but not necessarily, referring to the incidents we have already described.  For example, Sandra told a church acquaintance, Kathy Chidester (Chidester), that defendant choked her during a fight about three weeks before Sandra would later go missing on June 17, 2017.  Sandra also told a neighborhood prosecutor in the Los Angeles City Attorney's office, Tia Strozier (Strozier), about a time when defendant put his hands around her throat and held a pillow over her face, as well as an unreported incident occurring within a month of Sandra's disappearance in which defendant had grabbed her hair.

Sandra told others she planned to end her relationship with defendant at various times in 2016 and 2017.  Her supervisor at the United States Postal Service, Baybell Gutierrez (Gutierrez), testified Sandra told her sometime in 2016 that she wanted to transfer to another state to get away from defendant.  Michael testified Sandra said she was going to leave defendant several times.  He and Sandra had even moved out of the home in which they first lived with defendant, but Sandra allowed defendant to move into their new home.

"[j]ust one" prior incident of domestic violence, which she reported, and she was "not scared of [defendant]."  As we shall discuss in more detail, the prosecution called psychotherapist Patricia Prickett (Prickett) to testify about IPB and (among other things) provide context for Sandra's tone and certain statements during the interview with Officer Santizo.

4

According to the evidence at trial, Sandra took further steps to end the relationship in June 2017. About a week before her disappearance, Sandra appeared "very upset" at church and Chidester and her family helped Sandra change the locks at her home. Sandra told Chidester she wanted to divorce defendant and she knew how to go about doing so. Sandra told Michael the locks were being changed and she was "finally done" with defendant. Michael "could tell she was serious and she wanted to change." Sandra also told Hernandez she had changed the locks, defendant was "finally gone," and "[her] nightmare [was] almost over." She told Hernandez she wanted a divorce and had gone to see an attorney.

Just days before her disappearance, Sandra approached Strozier (the neighborhood prosecutor) in a courthouse hallway to ask about converting the existing protective order into a "full stay-away" order. Strozier testified she remembered the conversation vividly because this case "permanently affected [her], as a prosecutor, as a woman." Strozier told Sandra that defendant would need to be served notice before the protective order could be modified and referred her to a colleague in her office's victim assistance program. Sandra met with Strozier's colleague, Emily Janes (Janes), the same day and discussed the option of a civil restraining order.

### 2. Sandra's disappearance and death

On June 16, 2017, Sandra told Hernandez she was taking care of defendant's dog at his request. As she was leaving work on June 17, 2017, Hernandez saw Sandra sitting in her car "in a daze." Around 4:00 p.m. that day, defendant sent Sandra a text message asking her to bring the dog to see him at a dog park.

Sandra responded that she thought he was "in detox" but said she would "maybe" meet him after she got off work.  Around 6:41 p.m., Sandra sent defendant the message, "I'm here."

Defendant met Sandra at the dog park around 7:20 p.m. Defendant recorded video of their conversation, which was played at trial.  They discussed defendant's plans to enter a substance abuse treatment program, but defendant was evasive when Sandra asked him to identify the program.  When Sandra said she needed to leave, defendant prolonged the conversation by asking questions—including, for instance, whether she needed quarters for laundry.  Sandra told defendant she did not need anything from him and asked him to "[g]o away."  Defendant called Sandra as she was leaving the dog park and asked whether he could get his suit for church the next day.

Shortly after 8:00 p.m., Sandra asked defendant via text message and phone call—a recording of which was played at trial[3]—whether he was at a storage facility where they planned to meet.  Defendant said he was on his way, but Sandra told him she needed to leave and she would return by 8:00 a.m. the next morning.

Sandra arrived at a party around 9:00 p.m.  Gutierrez (her supervisor) was there.  Sandra seemed "flustered" and "nervous." She told Gutierrez she thought defendant was following her but she "managed to lose him."  Sandra left the party between 11:00 and 11:30 p.m. and declined Gutierrez's offer to follow her home.

Michael arrived home from work between 11:00 p.m. and 12:30 a.m. and heard Sandra talking to someone in her bedroom

---

[3]     An application on defendant's phone recorded all of his calls.

with the door closed. Michael noticed defendant's jacket and motorcycle helmet in the house. Michael did not hear defendant's voice, but he was upset because he "figured it was probably him" and he was worried defendant and Sandra had reconciled. Michael did not see Sandra the next morning, and Sandra's car was not outside when he left for work around 8:00 a.m.

Sandra received five text messages from defendant between 5:48 a.m. and 5:56 a.m. on June 18, 2017. Around 8:00 a.m., a surveillance camera captured Sandra's car entering a Van Nuys storage facility where defendant had rented a storage unit.[4] Defendant's unit was located near the end of a corridor shared with four other units. About 20 minutes after Sandra arrived, defendant backed Sandra's car up to the exterior door of the shared corridor at an angle and opened the trunk. Defendant then left the facility on his motorcycle around 9:05 a.m.

Defendant rode his motorcycle to a Target store across the street from the storage facility, parked, and returned to the storage facility on foot. Defendant had a recorded phone conversation with his sister around the same time. Among other things, defendant told his sister he was going to meet Sandra at their church. Defendant's sister noticed he was breathing hard.

Around 9:12 a.m., defendant drove Sandra's car from the storage facility to the Target parking lot. He parked and moved around in the back seat of the car until 9:53 a.m., when he left the parking lot on his motorcycle.

---

[4] The facility's surveillance cameras recorded only when they detected movement, so video from the morning of June 18, 2017, is not continuous.

Defendant arrived at the church he and Sandra attended between 10:10 and 10:20 a.m. and asked to meet with Bishop Eric Miele (Miele). Miele testified that defendant seemed "rushed" and "anxious." Miele noticed a scratch on defendant's face and fresh injuries on both of his hands. When defendant left, Miele sent two church members to Sandra's home to check on her. They were not able to make contact with her.

On his way back to the Target parking lot, defendant rode his motorcycle into an alley behind a Thrifty gas station, which was near the location where Sandra's body would be discovered two days later. Defendant parked his motorcycle near Sandra's car in the Target parking lot around 11:14 a.m. He went into Target and bought two bottles of bleach spray at 11:27 a.m. Defendant left the Target parking lot in Sandra's car a few minutes later. Shortly after noon, Sandra's car exited the alley near the Thrifty gas station. Defendant drove back to the Target parking lot, parked Sandra's car, and left on his motorcycle.

Michael and his two adult siblings were concerned about Sandra's welfare and entered her home accompanied by police officers on the evening of June 18, 2017. Sandra's bedroom "appeared ransacked." Los Angeles Police Department (LAPD) Detective Stefani Valdes, who worked in the missing persons unit, had a phone conversation with defendant the following day. Among other things, defendant said he had no recollection of when he last had contact with Sandra.

The day after that, firefighters responded to a fire burning in an overgrown area behind the Thrifty gas station and discovered Sandra's body. Arson investigators were unable to determine the cause of the fire, but samples of debris at the scene

contained "an ignitable liquid." Defendant's cell phone was used near the Thrifty gas station around the time the fire started.

Later the same morning, defendant called his aunt and, when discussing the missing person investigation, remarked, "[w]ell, if something happens to [Sandra], good, I'll get her benefits." When his aunt told him he should not "wish that on anybody," defendant said he was kidding. He later checked in to a drug rehabilitation center in Lake Arrowhead where he asked the intake nurse for bleach to clean his shoes.

Back at the storage facility, in the corridor outside defendant's unit, investigators found red stains that preliminary tests identified as blood. They also found a cigarette and two earring backings, one of which was broken. Inside the unit, investigators found a knife with a red stain on the blade. They also found a pill bottle containing white pills with red stains, a bra clasp, hair, and two earrings without backings.

Sandra's undergarments—including a bra with a clasp torn off and underwear with red stains—were found near a freeway offramp. Her purse was found nearby. Among other things, the purse contained a protective order against defendant and a domestic violence pamphlet.

Investigators also found red stains that preliminary tests identified as blood in Sandra's car. A red substance on the rear seat soaked through the cushion to the metal and plastic below. Dr. Odey Ukpo, a medical examiner in the Los Angeles County Coroner's office, testified he would not expect a dead body to leave that amount of blood. He opined it was more likely that the person was alive with a beating heart "creating pressure that would cause blood to leave the body."

9

Dr. Ukpo did not perform the original autopsy in this case, but reviewed photographs and various reports. He was unable to determine the cause of Sandra's death because of the extensive burns to her body. He opined that a fracture extending from Sandra's cheek to the base of her skull was caused by severe blunt trauma inflicted before she died. Dr. Ukpo stated this blow could have caused Sandra's death, but he could not rule out the possibility that she bled to death from a knife wound.

Defendant was arrested at the Lake Arrowhead rehabilitation facility on June 27, 2017. He had Sandra's California identification card and health insurance card in his possession.

### 3. *Propensity evidence*

Two of defendant's former partners, Mayra V. (Mayra) and Dolores S. (Dolores), testified at trial.

Mayra married defendant in 2014. They divorced after about a year. They had one child, but they were not together when their daughter was born. In June 2016, Mayra called the police when defendant tried to force his way into her home. Defendant had previously "stalk[ed]" Mayra, following her to and from work and threatening to hurt her and take their child. On the day that Mayra called the police, she testified defendant brought up their daughter but he "wanted for [them] to be together still." Mayra did not let him in because she "didn't want to be with him any[ ]more."

Mayra also testified that she called the police in January 2017 when defendant rode his motorcycle on to her driveway and "rev[ved]" the engine in a manner that "seemed violent." Defendant was "upset" and "said he wanted to talk and he

10

wanted to see [their] daughter." Mayra and her family went inside, but defendant tried to force his way through a door and "started to hit the window with his fist." Defendant left before the police arrived.

Dolores and defendant were in an "on-and-off" relationship from 2002 until around July 2005. They had two children together, but they lived together for only "a very short time." In November 2005,[5] defendant called Dolores and they argued about visitation with the children. Dolores forgot defendant still had a key to her apartment and when she "turned around, . . . he was there." Defendant "threw [Dolores] on the bed, and he choked [her]. And every time [she] would pass out, he would wake [her] up and choke [her] again until [she] would pass out. It probably happened about eight or nine times." Defendant "was mad about [Dolores] leaving him." "[H]e had this attitude" about Dolores's "audacity . . . to think that [she] could leave him, and that those were his children." Dolores's daughter called 911, and police photographed her injuries. Dolores testified at a subsequent trial, the outcome of which was not disclosed during this trial.

C.    *Verdict and Sentencing*

The jury found defendant guilty of first degree murder and found true the allegation that he personally used a deadly weapon. The trial court sentenced defendant to 26 years to life in

---

[5]    In their briefs, the parties suggest this incident occurred in September 2005. At trial, however, the prosecution asked whether the incident occurred in November 2005, and Dolores agreed that it had. No other evidence concerning the date was presented at trial.

11

state prison: 25 years to life for the murder plus one year for his personal use of a deadly weapon.

## II. DISCUSSION

Defendant presents several arguments for reversal: asserted instructional error, asserted error in admitting evidence, and an evidence sufficiency challenge to the jury's finding that Sandra's murder was deliberate and premeditated. None of the arguments have merit.

Defendant's claim of instructional error fails because the instruction he asked the court to give on voluntary intoxication was not supported by substantial evidence. Mere evidence that defendant was a habitual user of PCP does not support the inference that he was under the influence at the time of the murder, and evidence that he was high during prior violent episodes does not bear on his conduct under the different circumstances of a break-up.

Defendant's claims of evidentiary error also fail. The trial court did not abuse its discretion in admitting Prickett's testimony regarding IPB and its effects (the testimony was relevant to explain why Sandra continued to associate with defendant despite escalating violence and why she did not mention all prior acts of domestic violence to Officer Santizo), in overruling defendant's objection to Strozier's testimony that she was permanently affected by her conversation with Sandra (it was responsive to defendant's attempt to cast doubt on her recollection of details from a brief conversation years earlier), and in admitting Mayra and Dolores's testimony regarding prior acts of domestic violence (the probative value of the evidence— defendant's propensity for domestic violence when romantic

12

partners attempted to distance themselves from him—was not substantially outweighed by a danger of undue prejudice).

The jury's finding that defendant's murder of Sandra was premeditated and deliberate is supported by evidence of defendant's motive, planning, and manner of killing. Regardless of whether defendant actually stood to benefit financially from Sandra's death, the jury could reasonably conclude defendant acted on his stated belief that it would be "good" if something happened to Sandra because he would "get her benefits." And although some of defendant's actions immediately after the murder appear to have been improvised, the jury had reason to infer defendant planned to kill Sandra when he arranged to meet her in an isolated location armed with a knife. There is also substantial evidence for an inference that defendant had time to reflect between first incapacitating and then killing Sandra.

> A. *The Trial Court Properly Declined to Instruct the Jury on Voluntary Intoxication*
> 1. *Additional background*

Defendant asked the trial court to give an instruction based on CALCRIM No. 625 that would have told jurors, among other things, that they may consider evidence of voluntary intoxication when deciding whether defendant acted with an intent to kill or acted with deliberation and premeditation.[6]

---

[6] CALCRIM No. 625 provides, in full: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill[,] [or] [the defendant acted with deliberation and premeditation[,]] [[or] the defendant was unconscious when (he/she) acted[,]] [or the defendant <*insert other specific intent required in a homicide*

13

The trial court asked defendant's attorney to "[p]oint to the evidence that, at the point where [Sandra] was killed, that [defendant] was under the influence of drugs." Defendant's attorney identified (1) the cigarette found in the corridor outside defendant's storage unit, which was his "preferred method of ingestion of PCP"; (2) various discussions between defendant and others regarding his need to go to a rehabilitation facility; and (3) testimony about PCP's effects on defendant.

The trial court declined to give the requested instruction, reasoning "[t]here's no evidence at all, direct or circumstantial, that [defendant] was under the influence of any type of narcotic" at the time of the offense. The court further observed, "[w]hether or not he was high the night before or two weeks before or a month before or afterwards, that's irrelevant. It's on—at that time, at that date, in that circumstance, was he under the influence, and there is nothing in the evidence to support that he was."

### 2. Legal framework

"Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (Pen. Code, § 29.4, subd. (c).) "Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required

_____

*charge or other charged offense*>.] [¶] A person is *voluntarily intoxicated* if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of the defendant's voluntary intoxication for any other purpose."

specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought." (Pen. Code, § 29.4, subd. (b).)

A trial court is not required to give an instruction on voluntary intoxication absent a request by the defendant. (*People v. Bolden* (2002) 29 Cal.4th 515, 559.) Even then, a defendant is not entitled to a voluntary intoxication instruction unless, as pertinent here, there is substantial evidence of the defendant's voluntary intoxication. (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.) More specifically, there must be substantial evidence that the defendant was voluntarily intoxicated at the time of the offending conduct. (*People v. Marshall* (1996) 13 Cal.4th 799, 848.) In this context, "substantial evidence" refers to evidence """sufficient 'to deserve consideration by the jury' . . . .'" [Citation.]" (*People v. Wilson* (2005) 36 Cal.4th 309, 331.)

###### 3. *Analysis*

Defendant contends he was entitled to the requested instruction based on evidence that he habitually used PCP and he had been under the influence of PCP when he was violent toward Sandra on prior occasions.

Evidence that a person is a habitual substance abuser does not support the inference that the person was under the influence at a specific time. In *People v. Roldan* (2005) 35 Cal.4th 646, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, our Supreme Court held that "evidence that [the] defendant was a habitual user of marijuana [did not] constitute substantial evidence he was intoxicated or under the influence *at the time* of" the offense conduct. (*Id.* at 716.) Although the Court also noted the lack of "evidence of the effect,

15

if any, such alleged intoxication had on [the] defendant" (*id.* at 715), defendant's suggestion that we ignore *Roldan*'s holding regarding the probative value of habitual use is unpersuasive. That was the basis of the Court's ruling. (*Id.* at 716 ["Because the evidence [the] defendant was intoxicated at the time of the crime was 'at most minimal' . . . , the trial court properly refused the defense request to instruct the jury that his alleged voluntary intoxication precluded him from forming the specific intent to kill or to rob"].)

Defendant contends, however, the facts of this case are comparable to those in *People v. Humphries* (1986) 185 Cal.App.3d 1315. In that case, the defendant argued the trial court erred in excluding evidence of a prosecution witness's drug use that would support the defendant's theory that the witness committed the murder for which he was convicted. (*Id.* at 1328, 1336.) The Court of Appeal agreed that evidence indicating the witness "had used PCP *every day* for the two-month period ending three days before the murder [would be] sufficient to permit a trier of fact to conclude that he was a habitual user, and that in conformity to this habit, he had ingested PCP on [the day of the murder]." (*Id.* at 1338, emphasis added.) Our Supreme Court's ruling in *Roldan*, however, post-dates the Court of Appeal's ruling in *Humphries* and we therefore do not believe *Humphries* articulates governing law. In any case, there is no comparable evidence here that defendant used PCP on a daily basis.[7]

---

[7]     Other cases cited in defendant's opening brief are also readily distinguishable. In *People v. Vasquez* (1972) 29 Cal.App.3d 81, unlike this case, there was extensive evidence the defendant was intoxicated around the time of the offense conduct.

Defendant also contends the jury could have inferred he was high when he killed Sandra from evidence that he was high when he abused her on prior occasions, but this argument fails too.

Defendant's claim that "Michael testified the domestic violence occurred when [defendant] was on PCP" misstates Michael's testimony. When asked to explain how "drugs were an issue" in Sandra's relationship with defendant, Michael explained that he "noticed [defendant] . . . acting strange. Sometimes when [Michael] would come home from work, [he] would see [defendant] outside in the alleyway by the house. He just seemed strange all the time. [¶] And [Michael] soon realized that, like, when there used to be, like, domestic violence, that [defendant] was using PCP or had a history with that . . . ." Michael did not testify regarding any specific acts of domestic violence, and his reference to defendant's "history" with PCP underscores that he was not suggesting defendant was high every time he abused Sandra. At most, Michael testified that acts of domestic violence occurred during *periods* in which defendant was using drugs.

There were also statements by Sandra that she feared defendant only when he was under the influence. Even assuming these statements are reliable—and not merely attempts to cover for a partner she had not yet resolved to leave—they do not

_____

(*Id.* at 88-89.) In *People v. Scott* (2011) 52 Cal.4th 452, our Supreme Court held the trial court properly admitted evidence that a defendant accused of various late-night crimes had a habit of staying out late. (*Id.* at 490.) The fact that habit evidence may be probative of identity has no bearing on what constitutes substantial evidence that a defendant was intoxicated at a specific point in time.

17

support an inference that defendant was high on PCP when he killed her. The circumstances in which defendant killed Sandra were different than those in every prior instance of domestic violence. Although Sandra had previously discussed ending the relationship, several witnesses—Michael, Hernandez, Chidester, Strozier, and Janes—discussed new, concrete steps she had taken to do so in the week before her death.

Defendant's argument about what a jury supposedly could infer from testimony about prior violent episodes also does not reckon with the evidence of defendant's demeanor and actions at and around the time he killed Sandra. Defendant's back and forth trips to Target in an apparent effort to cover up the crime, and his conversations with his sister and Miele, are inconsistent with the evidence admitted at trial about how a person under the influence of PCP acts. Combined with the points already discussed, this demonstrates the defense of voluntary intoxication did not deserve consideration by the jury

> ### B. The Trial Court Did Not Err in Admitting Expert Testimony Regarding Intimate Partner Battering and Its Effects
> #### 1. Additional background

After defendant opted to play the recording of Officer Santizo's interview of Sandra in June 2017, the prosecution advised the trial court it intended to call an expert to testify about IPB and its effects. The trial court asked why the testimony was relevant, and the prosecution explained, "In the . . . video, [Sandra] expresses some minimizing, she says that there were no prior domestic violence incidents . . . ." The trial court interjected, "Well, she says there was one," and the

18

prosecution responded, "True. But that seems to be inconsistent with how she's represented it to family and friends, and she has a flat affect that I think [the] defense would argue is inconsistent with someone who is a real victim. So I think that there is enough that warrants explanation by an expert . . . ."

Defendant's trial attorney objected, arguing Sandra did not minimize defendant's prior acts of domestic violence in the interview and there was insufficient foundation for testimony regarding "certain behaviors." As to the latter point, defendant's attorney argued the prosecution was likely to ask the witness hypothetical questions "about things that they claim to have proved, and then have her opine as to those things, but pretend as if it has nothing to do with this case so that they can just say, in the end, 'Voila,' you know, 'Here's the expert. She knows all this. And she has testified that these exact same behaviors that [Sandra] exhibited in this particular case . . . , that they mean this.'"

The trial court ruled, "Based on that objection, . . . I'm going to allow it, because that's exactly what an expert is allowed to do.[8]

The prosecution's expert, Prickett, testified that intimate partner violence is "a pattern of coercive behaviors that are designed to control." She explained that not all victims are

---

[8]	After Janes (from the City Attorney's victim assistance program) testified, defendant's trial attorney raised a separate objection to the intended expert testimony on the ground it would be cumulative of Janes's testimony regarding the behavior of victims of domestic violence. The trial court overruled the objection, explaining that Janes's testimony on that score "came out on [defendant's attorney's] cross examination."

"meek," and it is not unusual for the victim to be the breadwinner in the relationship. Victims may confide in some people but not others, and it is common for them to minimize the severity and frequency of abuse. They may appear "numb" when describing the same events to multiple police officers. A victim will generally leave several times before "they stay gone." Prickett testified abusers are typically most dangerous when the victim leaves, and "75 percent of women who get killed get killed when they're leaving or after they've left. So there's a real fear that is grounded in fact for people leaving."

### 2. *Legal framework*

"In a criminal action, expert testimony is admissible . . . regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a).) "The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness. . . ." (Evid. Code, § 1107, subd. (b).)

The relevance of IPB evidence "is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility. [Citation.] Even if the defendant never expressly contests the witness's credibility along these lines, there is nothing preventing the jury from ultimately

finding in its deliberations that the witness was not credible, based on misconceptions that could have been dispelled by [IPB] evidence." (*People v. Riggs* (2008) 44 Cal.4th 248, 293.) IPB evidence may, among other things, help to explain why a victim of IPB remained in a relationship with their abuser (*id.* at 293-294; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 902) or downplayed abuse (see *People v. Brown* (2004) 33 Cal.4th 892, 906 [discussing relevance of IPB evidence under the more general expert witness statute, Evidence Code section 801]).

### 3. *Analysis*

Defendant contends the IPB testimony was not relevant because the jury could have properly evaluated Sandra's statements and conduct without any background "regarding intimate partner battering and its effects."[9] (Evid. Code, § 1107, subd. (a).) Defendant lists various respects in which he believes Sandra did not fit the profile of a victim of IPB, e.g., she had many friends and confidants, she did not minimize the abuse when speaking with the police, and she took steps to protect herself.

Defendant's argument rests on an incomplete accounting of the evidence. Although Sandra took some steps to protect herself from defendant, a layperson unschooled in IPB and its effects

---

[9] Defendant also suggests the trial court erred in allowing Prickett to testify that 75 percent of IPB victims who are killed are killed when they attempt to leave. Although the trial court sustained defendant's objection to a question aiming to have Prickett *repeat* this statistic, there was no objection when Prickett first mentioned it. The point is accordingly forfeited. (Evid. Code, § 353, subd. (a).)

21

might wonder why she continued to meet with him alone—including when she was killed. IPB evidence was relevant to explain this conduct and to allow jurors to advisedly evaluate Sandra's credibility. (*Riggs*, *supra*, 44 Cal.4th at 293 ["expert [IPB] testimony is relevant to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand"]; *Kovacich*, *supra*, 201 Cal.App.4th at 902 [expert IPB "testimony was necessary to disabuse jurors of commonly held misconceptions about victims of domestic violence, and to explain the psychological reasons for such a victim's seemingly self-impeaching behavior"].)

Additionally, IPB evidence was relevant to explain apparent discrepancies between Sandra's statements during the Officer Santizo interview and her statements to other people. In the video, Sandra told Officer Santizo there had been one prior incident of abuse, which she had reported. Sandra told Hernandez, however, that she and defendant "were always fighting" and "he would push her, grab her." Jurors could also reasonably have understood the unreported incidents Sandra mentioned to Chidester and Strozier to have occurred before the prior incident of abuse she mentioned when interviewed.

The trial court accordingly did not abuse its discretion (*People v. Mataele* (2022) 13 Cal.5th 372, 413) in determining that Prickett's testimony would help the jury evaluate why Sandra continued to meet alone with defendant despite escalating physical abuse and why she did not mention any unreported instances of abuse to Officer Santizo.

22

*C.    The Trial Court Did Not Err in Overruling*
*Defendant's Objection to Strozier's Testimony that the*
*Conversation with Sandra Permanently Affected Her*
*1.    Additional background*

As mentioned earlier, Strozier testified Sandra approached her in a courthouse a few days before she was killed, told her about two instances of domestic violence, and asked for help modifying the protective order.  In addition to these basic facts, Strozier described Sandra's demeanor.  Strozier stated she "immediately noticed that [Sandra] was concerned, that she was scared, but that she was still compassionate about . . . defendant."  Strozier was "able to assess her state of mind from not just how she was speaking . . . but the fact that . . . she did appear scared.  The way—the things that she described, she was fearful of [defendant], but she also had an understanding of his behavior and his history, and that came through in what she shared . . . ."

On cross-examination, defendant's trial attorney asked how long the conversation lasted, emphasized that it occurred in a courthouse hallway, and asked whether Sandra cried.  When Strozier affirmed that Sandra cried, defendant's attorney asked her to pinpoint what they were discussing at that time.

On re-direct, the prosecution asked Strozier why she recalled her interaction with Sandra so vividly.  Defendant's attorney objected on relevance grounds, the prosecution responded that the question went to Strozier's credibility, and the trial court overruled the objection.  Strozier answered, "Because this doesn't happen regularly.  This case has permanently affected me, as a prosecutor, as a woman.  And you just don't forget something like this."  Defendant's attorney objected again

and moved to strike Strozier's answer.  The trial court overruled the objection but ordered the prosecution to "move on."

### 2.    *Analysis*

Defendant contends his attorney did not attempt to test Strozier's recollection or credibility on cross-examination, and thus, the reason that she remembered the conversation so clearly was not relevant.  Defendant's argument lacks merit because defendant's trial attorney probed Strozier's recollection in at least two respects.  First, the question reiterating that Strozier spoke to Sandra in a courthouse hallway can be construed as an attempt to emphasize the conversation occurred only in passing or only amid possible distractions.  Second, the questions regarding whether and precisely when Sandra cried had no conceivable purpose other than to test Strozier's recollection. Defendant's contention that this reading of the cross-examination is "specious" because the question regarding *when* Sandra cried was "merely [a] follow[ ]-up to a previous question" fails to acknowledge that the "previous question"—*whether* Sandra cried—can also be understood as an effort to challenge credibility by seeking to elicit a detailed recollection.

Although the defense's efforts to undermine Strozier's recollection of Sandra's demeanor during a conversation that took place nearly five years before trial were not successful, defendant's claim that "the cross-examination was narrowly curtailed to elicit additional facts" is not supported by the record. The trial court did not abuse its discretion in ruling that Strozier's reasons for remembering the conversation in such vivid detail were relevant.

24

*D.*   *The Trial Court Did Not Err in Admitting Evidence of Domestic Violence Against Defendant's Previous Partners*

*1.*   *Additional background*

As summarized earlier, defendant's former partners Mayra and Dolores testified regarding several prior acts of domestic violence.  Before the women testified, defendant's trial attorney objected that the probative value of Mayra's testimony would be substantially outweighed by the danger of undue prejudice because defendant did not physically abuse Mayra and she was likely to mention facts unrelated to domestic violence.  The trial court overruled the objection, emphasizing, among other things, that Mayra was "a prior spouse, it is not remote in time, and . . . it is relevant."

Dolores was originally expected to testify to several instances of domestic violence in addition to the single incident from November 2005 that was discussed at trial.[10]  The trial court, however, ruled that only evidence regarding the November 2005 incident would be admitted and it would be admitted, despite its remoteness, because both Dolores and Sandra "were pulling away from the defendant, and the defendant didn't seem to like that. . . .  [T]he similarities are that they were separating,

---

[10]   These included a February 2003 incident in which defendant threw a remote control at her face; a series of incidents in January 2004 in which defendant kicked Dolores, prevented her from escaping a car by grabbing her baby's leg, repeatedly hit her with a bottle, and hit her in the head with a broomstick; and an incident in 2004 or 2005 in which defendant put a cigarette out on Dolores's arm.

25

basically told to stay away, there was anger involved in it, et cetera."[11]

Later in the proceedings, defendant's attorney argued Mayra and Dolores's testimony should be excluded because the prosecution chose not to present all evidence of prior domestic violence against Sandra, including body-worn video recorded by a police officer investigating an incident on April 7, 2016. The trial court determined the prosecution's decision not to introduce certain evidence had no impact on its earlier rulings about what evidence would be admitted.

### 2. *Legal framework*

As a general matter, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." (Evid. Code, § 1101, subd. (a).) The Legislature has, however, carved out exceptions permitting the use of "'so-called "propensity" or "disposition" evidence'" in specific cases.[12] (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.)

The exception pertinent here, Evidence Code section 1109 (Section 1109), provides that "in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence

---

[11] The trial court also excluded testimony by two other former partners that defendant abused more than 10 years prior to the charged offense.

[12] Defendant does not challenge, on any ground, the statutes permitting the use of such propensity evidence.

is not made inadmissible by [Evidence Code] Section 1101 if the evidence is not inadmissible pursuant to [Evidence Code] Section 352." (§ 1109, subd. (a)(1).) Evidence is inadmissible under Evidence Code section 352 if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." In this context, courts have read Evidence Code section 352 to require the probative value of propensity evidence to "''be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses.''' [Citation.]" (*People v. Thomas* (2021) 63 Cal.App.5th 612, 630.) "''The principal factor affecting the probative value of an uncharged act is its similarity to the charged offense.''' [Citation.]" (*Ibid.*)

"Evidence of acts occurring more than 10 years before the charged offense" is subject to the further requirement that the trial court must "determine[ ] that the admission of this evidence is in the interest of justice." (§ 1109, subd. (e).) "Thus, while evidence of past domestic violence is presumptively admissible under [Section 1109,] subdivision (a)(1), subdivision (e) establishes the opposite presumption with respect to acts more than 10 years past." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 537, fn. omitted.) The "more stringent standard of admissibility" for evidence of acts occurring more than 10 years before the charged offense does not, however, "necessitate[ ] an inquiry different in kind from that involved in a determination under section 352." (*Id.* at 539.) Evidence of such acts is

27

admissible so long as its "probative value weighs more heavily on th[e] same scales" used in the Evidence Code section 352 analysis. (*Ibid.*)

We review the trial court's decision to admit evidence of prior acts under Section 1109 for abuse of discretion. (*Johnson*, *supra*, 185 Cal.App.4th at 531.)

### 3.    *Mayra*

Defendant principally contends the trial court abused its discretion in admitting Mayra's testimony regarding prior acts from 2016 and 2017 because these were not sufficiently similar to any of his acts against Sandra. Specifically, defendant asserts these acts occurred "well after [Mayra] and [defendant] had divorced" and "[t]he [January 2017] incident . . . arose because [Mayra] was refusing [defendant's] demand to see his daughter."

Contrary to defendant's argument, the fact that Mayra and defendant were divorced at the time of the June 2016 and January 2017 incidents strengthens the comparison to this case. Sandra had effectively barred defendant from her home by changing the locks, she was seeking a no-contact protective order, and there was evidence she had consulted an attorney about obtaining a divorce. In both Mayra's case and Sandra's case, defendant was dealing with a former partner who had taken clear steps to end their relationship.

Defendant's purported desire to see his child when he twice attempted to force his way into Mayra's home is a difference, but a superficial one. At least with respect to the first incident in June 2016, Mayra testified that defendant had dual motives and "wanted for [them] to be together still." Defendant also employed a similar tactic to maintain contact with Sandra in this case even

28

though they did not have children together. Defendant asked Sandra to take care of his dog while he was ostensibly receiving substance abuse treatment and then, the night before he killed her, asked her to bring the dog to see him at a dog park. In both relationships, defendant used his purported desire to see a child or a dog as a reason to maintain contact with a former partner.

The trial court did not abuse its discretion in determining defendant's conduct toward Mayra after their relationship ended was sufficiently similar to his conduct toward Sandra and that its probative value outweighed countervailing considerations. Defendant's conduct toward Mayra was far less inflammatory than the charged offense because he did not inflict any physical injury, there was little risk of confusion, the incidents involving Mayra occurred less than two years before Sandra was killed, and Mayra's testimony was brief, especially seen in context of a trial that involved more than 30 witnesses.

### 4. Dolores

Because the November 2005 incident described by Dolores occurred nearly 12 years before Sandra was killed, the more stringent standard set forth in Section 1109, subdivision (e) applies. Defendant argues the trial court abused its discretion in determining this standard was met based on the remoteness of the November 2005 incident, dissimilarities between that incident and the charged offense, the availability of alternative propensity evidence, and his inability to cross-examine Dolores with a transcript of her testimony in criminal proceedings that arose from the November 2005 incident. None of these arguments establishes an abuse of discretion.

"Remote prior conduct is, at least theoretically, less probative of propensity than more recent misconduct. [Citation.] This is especially true if the defendant has led a substantially blameless life in the interim [citation] . . . ." (*Johnson*, *supra*, 185 Cal.App.4th at 534, fn. omitted.) Here, defendant engaged in similar conduct with both Mayra and Sandra in the period between the November 2005 incident and Sandra's death in June 2017. Moreover, defendant was not so young—he was 34 years old in November 2005 and 46 years old in June 2017—that the incident with Dolores may be characterized as a youthful mistake. Under these circumstances, the remoteness of the November 2005 incident did not materially weaken its probative value.

Defendant argues the November 2005 incident is dissimilar to the charged conduct because it arose from Dolores's "refus[al] to let [defendant] see their children" and "occurred long after the parties had separated." Neither of these statements is wholly accurate. The November 2005 incident occurred less than six months after Dolores and defendant's final break-up. And Dolores testified that defendant was, at least in part, angry with her for having left him. In addition, as we have already discussed in connection with Mayra, the fact that defendant's children played a nominal role in defendant's prior acts of domestic violence toward Mayra and Dolores does not meaningfully distinguish these acts from the charged conduct.

Defendant's argument that the trial court should have excluded Dolores's testimony because the prosecution could have presented evidence of at least one additional instance in which defendant abused Sandra fails to account for the trial court's exclusion of other propensity evidence. (*People v. Merchant*

30

(2019) 40 Cal.App.5th 1179, 1193 ["It is significant that the court excluded [other] items of prior act evidence"].) Dolores's testimony also had unique probative value. A pattern of conduct involving multiple women is more probative of a propensity to commit domestic violence than cumulative incidents involving the same partner. (*Id.* at 1194 ["the fact that [the defendant] engaged in domestic violence against two different women *strengthens* its probative value on propensity"].) And the November 2005 choking attack on Dolores was more similar to the charged offense—which also occurred after a break-up—than an incident that occurred early in defendant's relationship with Sandra.

Courts may consider "'[t]he degree of certainty'" of a prior act's occurrence in weighing its probative value against the risk of undue prejudice. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1116 [weighing factors with respect to the admissibility of evidence of other sexual offenses under Evidence Code section 1108].) Defendant argues the events Dolores described are highly uncertain because defendant's trial counsel represented to the court that charges stemming from the November 2005 incident were dismissed in the interest of justice and the transcript of Dolores's testimony was no longer available. But defendant's trial attorney had a copy of a police report from the incident that she used when attempting to impeach Dolores on cross-examination. We therefore believe there was no concern about the degree of certainty of the Dolores abuse evidence that materially affects the Section 1109, subdivision (e) analysis.

The trial court acted within its discretion in ruling the Section 1109, subdivision (e) standard for admission of evidence was met. Defendant's conduct just months after his relationship

31

with Dolores ended has striking similarities to his conduct involving Sandra. Although defendant's abuse of Dolores was violent, it was less inflammatory than the charged offense and on a par with other prior acts of domestic violence against Sandra. There was also little risk that the jury would confuse the issues, and, though remote, defendant's conduct in November 2005 was part of a recurring pattern.

### E. Cumulative Error

Defendant contends that even if the asserted instructional and evidentiary errors are not prejudicial when considered individually, the cumulative effect of those errors requires reversal of his conviction. Because we have found no error, there is no cumulative error. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1020.)

### F. Substantial Evidence Supports the Jury's Finding that the Murder Was Premeditated and Deliberate

To support a conviction for premeditated and deliberate first degree murder, there must be sufficient evidence that the murderer thought about his conduct in advance. (*People v. Cage* (2015) 62 Cal.4th 256, 276.) "'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .' [Citation.] Such reflection may be revealed by planning activity, motive, and the manner of the killing[ ], among other things. [Citations.]" (*People v. Potts* (2019) 6 Cal.5th 1012, 1027.) If these categories of evidence are not all present, courts often "'require either very strong evidence of planning, or some evidence of motive in

conjunction with planning or a deliberate manner of killing.' [Citation.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1224; see also *People v. Combs* (2004) 34 Cal.4th 821, 850 [the planning, motive, and manner factors derived from *People v. Anderson* (1968) 70 Cal.2d 15 "are not exclusive, nor are they invariably determinative"].) All three categories of evidence are present in this case.[13]

As to motive, defendant told his aunt it would be "good" if "something happen[ed]" to Sandra because he would "get her benefits." Defendant points out that he already enjoyed some of Sandra's benefits and speculates "he would lose [these] if she died." We do not need to speculate about the availability of survivor benefits—or the potential impact of a divorce on defendant's eligibility for benefits—because a motive need not be rational. (*People v. Pettigrew* (2021) 62 Cal.App.5th 477, 495.) The jury could reasonably infer from defendant's own statements that he was motivated to kill Sandra based on his belief—correct or not—that he would benefit financially.

As to planning, it is significant that defendant was armed with a knife when he met Sandra at the storage facility. (*Potts*, *supra*, 6 Cal.5th at 1027 ["The evidence that [the] defendant

---

[13] Defendant suggests the prosecution conceded there was no evidence of planning or motive in its closing argument when it emphasized that premeditation and deliberation are not synonymous with planning and it need not prove motive. Defendant misreads the argument, but the issue is irrelevant in any case. (*People v. Perez* (1992) 2 Cal.4th 1117, 1126 ["It is elementary . . . that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury"].)

arrived at the [victims'] home carrying a weapon suggests that the murders were planned"].)  Nothing in the record indicates defendant made a habit of carrying a knife.  (*Id.* at 1027-1028.) Additionally, the jury could reasonably infer that defendant arranged to meet Sandra in an isolated location for the purpose of killing her.  (*People v. Silva* (2001) 25 Cal.4th 345, 369 ["the murder's isolated location, selected by [the] defendant, is itself evidence of planning"].)  The fact that defendant appeared to improvise certain elements of the cover-up—buying cleaning supplies and scouting a site to dispose of Sandra's body *after* killing her—does not refute the substantial evidence of planning. (*People v. Renteria* (2022) 13 Cal.5th 951, 970 ["'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding"].)

Defendant's efforts to destroy Sandra's body made the precise manner of killing difficult to pin down, but the bloody knife in the storage unit and Dr. Ukpo's testimony that Sandra suffered a severe blow to her head before she died supports an inference that defendant's attack came in two stages, affording defendant an opportunity to reflect.  (*People v. Williams* (2018) 23 Cal.App.5th 396, 410 [evidence of "intentional and deliberate manner of killing" included "two neck stabs, with an implied interval to reflect, as well as the infliction of blunt force trauma in different areas of the victim's body"]; *People v. Streeter* (2012) 54 Cal.4th 205, 244 [manner of killing "demonstrate[d] premeditation and deliberation" where the "defendant's acts occurred in stages"], overruled on other grounds as stated in *People v. Harris* (2013) 57 Cal.4th 804, 834.)

Because there is substantial evidence that defendant had a motive to kill Sandra, planned in advance to do so, and employed a manner of killing that reflects premeditation and deliberation, there is no basis to disturb the jury's first degree murder verdict.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, Acting P. J.

We concur:

MOOR, J.

KIM, J.